MICHAEL AND APRIL McINTYRE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McIntyre v. Commissioner
Docket No. 14835-84.
United States Tax Court
T.C. Memo 1988-97; 1988 Tax Ct. Memo LEXIS 123; 55 T.C.M. (CCH) 320; T.C.M. (RIA) 88097; March 3, 1988. Michael McIntyre, pro se. Mitchell I. Horowitz, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION [1]
PARR, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' income tax: Addition to Tax
Year
Deficiency
Sec. 6653(b) [2]
1977
$  1,543.00
$ 771.50
1978
288.00
144.00
1979
35,789.33
17,894.77
1980
44,095.00
22,047.50
*126 The issues for 1977 and 1978 involve carrybacks from 1980 (below). For the 1979 taxable year we must decide (1) whether petitioners are entitled to and have adequately substantiated the following deductions: (a) broker's salesmen expense of $ 46,675, (b) employee business expense of $ 9,916.23, (c) excess sales tax, and (d) casualty loss of $ 9,900. For the 1980 taxable year we must decide (1) whether petitioners failed to report additional income of $ 39,146.99; (2) whether petitioners are entitled to and have adequately substantiated (a) employee business expense of $ 5,819, (b) miscellaneous itemized deductions of $ 10,686, and (c) excess sales tax deduction and; (3) whether, in connection with a computer software investment, petitioners are entitled to a $ 28,000 loss deduction and a $ 45,000 investment tax credit (of which $ 7,039 was claimed in 1980; and $ 1,543, $ 288 and $ 3,360 were carried back to 1977, 1978 and 1979, respectively). Finally, we must decide whether petitioners *127 are liable for the 50 percent addition to tax for fraud under section 6653(b) for all years in issue. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners, Michael and April McIntyre, resided in Miami Shores, Fla., when they filed their petition in this case. During 1977 through 1979, they lived in Miami, Fla. and in 1980 they lived in Fort Lauderdale, Fla.
Michael McIntyre (hereinafter petitioner) was born in California and raised in Florida. In 1971 he entered the University of Washington where he had a full scholarship for swimming. Petitioner studied political science and business at the University of Washington. He also took some courses in accounting, investments and investment securities. Petitioner met his wife April while in college. April McIntyre was raised in San Francisco, Calif. and also attended the University of Washington. Petitioner left the university in the spring of 1975 without having obtained his bachelor's degree. He moved to Long Beach, Calif., where he trained full time for the Olympic Swim Team and worked part time. April *128 McIntyre graduated the following semester with a bachelor's degree in history and joined petitioner in California. Petitioner and April McIntyre were married on February 14, 1976. In late 1976 or early 1977 petitioners moved to Miami where they rented an apartment for about two years. In late 1978 petitioners purchased their first home for $ 62,500, with a down payment of $ 12,500. Petitioners had part of the down payment, but borrowed the rest, approximately $ 9,000, from petitioner's parents. 1979
(1)(a) Broker's Salesmen Expense
During 1979 petitioner was a self-employed insurance salesman and securities broker. He operated through Investacorp, Inc., a subchapter S corporation of which he was president. Petitioners together owned 81 percent of Investacorp's stock. [3] Investacorp acted as a broker-dealer for insurance, stocks, bonds, and mutual funds. Petitioner devoted 100 percent of his time to Investacorp. [4]
*129 Petitioner's father and maternal grandmother worked out of Investacorp's offices. Petitioner's father Richard McIntyre served as general partner of several partnerships underwritten by Investacorp. Petitioner's grandmother Gloria Mortimer was in the real estate business. She also referred clients to Investacorp for mutual funds. Some confusion arises because of the manner in which petitioners reported income and deductions arising from Investacorp. Petitioners attached Schedules K-1 (Form 1120S) to their 1979 individual income tax returns. The K-1 forms show undistributed taxable income from Investacorp of $ 43,795 for Michael McIntyre and $ 25,762 for April McIntyre. The K-1 forms indicate a fiscal year beginning November 1, 1978 and ending October 31, 1979. These amounts were entered on Part III of Schedule E, Form 1040, but were incorrectly shown as income from partnerships rather than from small business corporations. We do not know how the amounts shown were determined since no Form 1120S (U.S. Small Business Corporation Income Tax Return) is in evidence. Gross corporate income less deductions such as commissions or expenses should have been taken into account in arriving *130 at the bottom-line amounts reported on petitioner's Schedule E. Without the corporate return, however, we have no way of determining what income and deductions were actually claimed by Investacorp. Petitioner received $ 33,320 in commissions from Investacorp on July 27, 1979 and reported this amount on Schedule C of petitioners' 1979 individual income tax return. He also reported $ 1,087.02 commission income from Mid-America Insurance Co., [5] for total Schedule C gross receipts of $ 34,407.02. On their 1979 Federal income tax return petitioners claimed a Schedule C commissions expense deduction of $ 45,675, which respondent disallowed. The claimed deduction was based on the payment of $ 3,675 to petitioner's grandmother Gloria Mortimer and two payments to petitioner's parents, for $ 9,000 and $ 33,000. On July 30, 1979 petitioner issued a check for $ 3,675 to his grandmother drawn on petitioners' personal joint checking account. On August 3, 1979, petitioner issued a check marked "for home loan" to his father *131 Richard McIntyre for $ 9,000. On August 15, 1979, petitioners deposited $ 33,000, which they got from the financial officer of Investacorp, into their joint checking account. This amount was not included in the income reported on petitioner's Schedule C. That same day April McIntyre issued a check to Joanne McIntyre, her mother-in-law, for $ 33,000. To substantiate these deductions, petitioners attached three Forms 1099-Misc (copy A) (one for each check) to their 1979 Federal income tax return. Petitioners failed to separately send the copies to the IRS Service Center as required. Petitioners did not include the recipients' social security numbers on the forms, as required. No evidence was produced at trial to show that these particular payments were reported as income by the recipients on their 1979 returns. Although we held the record open 60 days for submission of the returns of Gloria Mortimer and Richard McIntyre, they were never submitted. Petitioners have the burden of proving entitlement to these and all other deductions at issue in this case. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Ordinary and necessary expenses incurred in carrying *132 on a trade or business are deductible. Section 162. However, personal, family, and living expenses are not deductible. Section 262. Petitioner has failed to convince us that he is entitled to the "commission" deductions. The payment to Richard McIntyre for $ 9,000 was marked "for home loans." Petitioner professes that the check was mismarked and it was not in fact to repay a home loan. He testified: I remember that when I made out the check and I had given it to my father, he said -- I had put down "home loan" because I wanted to pay him back for the house, and he said not to do it that year and to wait and pay him back later, because he had some substantial losses, and he said to 1099 him on the money. Petitioner could not tie the $ 9,000 to any particular sales by his father. Richard McIntyre testified that he had lent his son approximately $ 9,000 for a downpayment on his home and that the amount was repaid. Petitioner offered no evidence to show any other $ 9,000 payment to his father. Under these facts, it strains credulity to say the $ 9,000 was a commission payment from Investacorp to Richard McIntyre. We find it represented repayment of a loan, and is a personal, *133 nondeductible expense. The second payment was for $ 33,000 and was made from April McIntyre to Joanne McIntyre. The payment was made on the same day petitioners deposited a check for $ 33,000 they received from the financial officer of Investacorp. The symmetry of payments suggests that the check to Richard McIntyre could possibly have been for commissions due to him from Investacorp. Several facts militate against this interpretation, however. First, the payment was made by April McIntyre to Joanne McIntyre, neither of whom worked for Investacorp. Second, no other commissions were paid in this manner during the course of 1979. Third, Richard McIntyre testified he did not remember whether the $ 33,000 represented commissions or a refund of his own overpayments to Investacorp, or whether the payments to him were paid by the corporation or petitioner. He could not state with certainty what amount if any he reported as income on his own 1979 tax return. Finally, petitioner and Richard McIntyre are father and son and the existence of this close family relationship causes us to more closely scrutinize the transaction as a whole. We found Richard McIntyre evasive and unusually *134 "forgetful", and we do not give much weight to his testimony. Moreover, neither he nor petitioner offered any explanation for the unusual manner in which the payment was made. On the facts presented we are not convinced that the payment of $ 33,000 from April McIntyre to Joanne McIntyre was in fact a commission payment to Richard McIntyre which petitioners are entitled to deduct. We are similarly unconvinced that the payment to Gloria Mortimer was a commission payment by Investacorp to her merely filtered through petitioners' checking account, or is otherwise deductible by petitioner. Petitioners failed to produce evidence that Mrs. Mortimer included the amount in income. Petitioner did not call Mrs. Mortimer as a witness, nor did he offer her 1979 return. We therefore infer that the production of such evidence would have been unfavorable to petitioner. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). As with the payment to petitioner's parents, this payment was a unique occurrence. Mrs. Mortimer is petitioner's grandmother. The check was drawn on petitioners' personal joint checking *135 account. Moreover, as with the payments to Richard McIntyre, there is no evidence that petitioner took these amounts into income. If he were a mere conduit for payment by Investacorp and had included the amount in his income, he would have been entitled to a corresponding deduction. [6]
We are unconvinced that the payments to petitioner's parents and grandmother represented bona fide commission payments. If they were commissions, however, it seems most likely they were obligations of the corporation, accounted for at the corporate level and reflected in the amounts shown on petitioner's K-1 forms and Schedule E. Much of the evidence also leads us to believe the payments were in fact personal in nature. It is clear to the Court that the $ 9,000 payment to Richard McIntyre was a loan repayment. Moreover, the $ 33,000 check was paid by April McIntyre to Joanne McIntyre, neither of whom worked for Investacorp. Also, petitioner failed to produce any evidence whatsoever which would indicate Richard McIntyre had earned $ 33,000 or that Gloria Mortimer earned $ 3,675 in commissions. *136 Another factor we consider in concluding the payments were personal in nature is that petitioner erroneously attached the 1099 forms to his own tax return, thereby "substantiating" his deductions, but not properly giving respondent notice to determine if the sums were correctly reported as income by the recipients. (b) Employee Business Expense
In 1979 petitioners claimed employee business expenses of $ 13,435. These expenses were for fares, meals and lodging, car expenses, outside salesperson expenses, travel and entertainment expenses and country club expenses. Respondent allowed $ 3,519.61 of the deductions. Petitioners traveled to the west coast from December 7, 1979 to December 28, 1979, with their six-month-old son. Petitioners visited the cities where they went to college and where April McIntyre's family lived. Petitioner claims he was doing business for Investacorp in those cities where he had contacts. Petitioner did hold some business meetings on the west coast. Petitioners claimed fare expenses of $ 666.21. They provided receipts for over $ 1,000 in fare expenses. Respondent allowed a deduction of $ 238 for a business trip to New York from Miami. Respondent *137 disallowed a car rental expense incurred in Miami because petitioners failed to establish a business purpose. Respondent disallowed the remaining fare expenses because they were incurred in connection with petitioners' west coast trip. Petitioners claimed meal and lodging expenses of $ 2,200, based on 50 days at $ 44 per day. Respondent allowed $ 176 and disallowed the remainder because it was for expenses incurred during the trip to the west coast (23 days for two people at $ 44/day). Petitioners also claimed travel and entertainment expenses of $ 5,980.68 in 1979. They presented receipts and explanations totalling $ 2,234.75. Petitioners incurred $ 736.96 of that amount while on the west coast; thus, respondent disallowed that portion of the substantiated expenses. It is well established that travel expenses are deductible only if they are ordinary and necessary to the conduct of petitioner's business and directly attributable to it. Section 162(a)(2); section 1.162-2(a), Income Tax Regs. If, however, "the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible, even though the taxpayer engages in business activities while *138 at such destination." Section 1.162-2(b)(1), Income Tax Regs.
Petitioners claim the trip was primarily for business and the fact they had family and friends in California and Washington made the possibility of making successful business contacts more likely. Petitioner presented some evidence of business meetings that took place as part of his entertainment expenses, but not enough to indicate, under all the circumstances, that this trip was primarily for business reasons. Therefore, petitioners are not entitled to deduct fare expenses incurred on the west coast or those for which they failed to prove a business purpose. Likewise, since the trip was primarily personal in nature, petitioners are not entitled to deduct $ 2,024 in lodging expenses while on the west coast. Conversely, petitioners have substantiated [7] travel and entertainment expenses to the extent of $ 2,234.75. Respondent disallowed $ 736.96 of this amount because the expenses were incurred during petitioners' west coast trip. The fact that the trip was primarily personal will not preclude a deduction for expenses directly related to the conduct of his business. Section 1.162-2(b)(1), Income Tax Regs. As such, *139 petitioners are entitled to a deduction of $ 2,234.75 for entertainment expenses. *140 Petitioners claimed outside salesperson expenses of $ 626.61. Respondent allowed $ 123.22 of this amount. Petitioners did not produce any evidence to warrant a deduction in excess of the $ 123.22 allowed by respondent. Petitioners claimed car expenses of $ 3,122.34. This deduction was based on actual expense incurred. Respondent allowed only $ 1,014.98 of petitioners' actual car expenses. Petitioners also claimed that 84.5 percent of the mileage on their 1972 Cadillac deVille was business related and that 77 percent of the mileage on their 1974 Cadillac El Dorado was business related. Respondent determined that both cars were used 50 percent in business and 50 percent for personal use. Petitioners were permitted a deduction of $ 1,484.60 based on mileage rate since it exceeded the actual expenses. Petitioners presented no evidence to establish their entitlement to a deduction greater than that allowed by respondent. Petitioners also claimed a deduction of $ 840 for expenses of two country clubs. Like other entertainment costs, club expenses are subject to the substantiation requirements of section 274. Of this amount, $ 800 was for membership and club expenses and $ *141 29.52 was designated for a business meeting with a client. Respondent disallowed all expenses connected with the country club. In order to deduct these expenses petitioners must first prove that the club was used primarily for business rather than personal reasons. Section 274(a)(2)(c). With the exception of one receipt for a business meeting, petitioners presented no evidence to substantiate their claim that the country clubs were used primarily for business. Therefore, petitioners are not entitled to deduct any expenses in connection with the country clubs. (c) Sales Tax Deduction
In 1979 petitioners claimed a sales tax deduction in excess of the table amount allowed for Florida residents during that year. Petitioners presented no evidence at trial to substantiate their claim. Therefore, they have failed to meet their burden of proof and cannot deduct any amount greater than that allowed by respondent. [8]
(d) Casualty Loss
In 1979 petitioners owned a used 18-foot Jet King ski boat, a gift from petitioners' parents, Richard and Joanne McIntyre. Richard McIntyre *142 bought the used boat in 1975. He did not remember how much he paid for the boat. However, attached to the application for new title was a receipt for Sales Tax on Motor Vehicle for the State of Florida, County of Dade indicating a purchase price of $ 400. Richard McIntyre also has no recollection of additions or repairs to the boat during the time he owned it. When petitioners first took possession of the boat in May 1978, they kept it on a trailer in the parking lot of their apartment building. After they purchased their house they moved the boat, on the trailer, to the side yard of their home. Petitioners frequently used the boat on weekends, but petitioners had no insurance on the ski boat. Petitioners sold the boat at the end of 1979 for $ 150. Alexander Hajinkolaou purchased the boat through a third party and had no direct contact with petitioners. The boat was in poor condition when Hajinkolaou bought it. The engine was burned out, the paint was faded from the sun and the seats were no good. Petitioners claimed a casualty loss of $ 9,900 on the ski boat due to fire. On Form 4684 (Casualty and Loss) they claimed a basis of $ 13,000 in the boat and a pre-casualty *143 fair market value of $ 10,000. Petitioners claim the post-casualty fair market value was $ 100. Petitioners had no photographs of the boat from either before or after the alleged fire. A taxpayer is entitled to a deduction for a loss sustained during the taxable year due to fire, storm or other casualties to the extent not compensated by insurance or otherwise. Section 165. The amount of the loss is deductible to the lesser of the taxpayer's adjusted basis in the property or the difference between the fair market value before the casualty and fair market value after the casualty. Section 1.165-7(b)(1), Income Tax Regs.
Since petitioners received the Jet King ski boat as a gift from petitioner's parents, their original basis in the boat is the same as the basis in the hands of the donor at the time of the gift. Section 1015. Richard McIntyre, the donor, testified that he did not remember exactly when he gave the boat to his son, nor could he remember what he had paid for the boat. He also could not remember whether or not he had made any repairs on the boat. When Richard McIntyre applied for a new certificate of title for the boat on September 29, 1975, the stated total purchase *144 price of the boat was $ 400. Petitioner signed that receipt on behalf of his father under penalty of perjury. Thus, the evidence indicates that petitioner had a basis of $ 400 in the boat when it was given to him in 1978. Petitioner claims to have made improvements on the boat when he owned it. He submitted a telegram from someone claiming to have done a substantial amount of work on the boat and who saw the boat after the fire. However, we remain unconvinced that petitioners' basis exceeded $ 400. More importantly, however, petitioner's testimony and the letter from an "unknown mechanic" do not convince us that the fire actually occurred. The subsequent purchaser of the boat, Mr. Hajinkolaou, stated the boat was in poor condition, but that there had not been a fire. We found Mr. Hajinkolaou to be completely credible. Considering the testimony and petitioners' inability to produce any photographs or documentary evidence as to the boat's value and the fire, we are unable to allow any deduction for a casualty loss. 1980
1. Unreported Income
In 1980 petitioners received a check in the amount of $ 39,146.99. The check was drawn on the Canadian Imperial Bank of *145 Commerce in Potters Cay, Nassau, Bahamas. The amount was a return of funds from Gerald Simons for a failed investment in rental property in the Bahamas. The money was originally sent to Simons by petitioners in the form of money orders. Petitioners claim the money came from a cash hoard. Generally, petitioners bear the burden of proving the incorrectness of the Commissioner's determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners in this case attempt to shift the burden of going forward with the evidence to respondent relying on the reasoning in Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979). Petitioners' reliance is misplaced. In Weimerskirch the Commissioner's notice of deficiency was based on unreported illegal income. The court held that the Commissioner has the burden of connecting the taxpayer to the illegal activity before the statutory notice of deficiency is presumed correct. Otherwise, the statutory notice would be arbitrary and erroneous. See also Llorente v. Commissioner,649 F.2d 152 (2d Cir. 1981), affg. in part and revg. in part and remanding 74 T.C. 260 (1980). *146 In this case respondent's determination is not based on illegal activity but on one particular bank deposit. A bank deposit is prima facie evidence of income. Tokarski v. Commissioner,87 T.C. 74 (1986). There is no question that petitioners received the money in 1980 and that it was a return of their own funds. The question is the original source of the funds. Since respondent's determination was not arbitrary, petitioners retain the burden of going forward as well as the burden of proving that respondent's determination was erroneous. A return of one's own money would not generally be includable in income. However, this Court has previously held that a taxpayer's inability to establish a nontaxable source for a deposit to a brokerage account rendered the amount taxable income in the year of the deposit. Hollman v. Commissioner,38 T.C. 251, 261 (1962). Similarly, if petitioners cannot establish a nontaxable source of the $ 39,146.99 check, this amount would be taxable to them in 1980, the year of the deposit. Petitioners claim they acquired the money between 1971 and 1978 through gifts, sale of a car and loans petitioner received from *147 his father while in college. Petitioners also claim that rather than putting this money in the bank, investing it or using it for the downpayment on their home, they chose to keep the money in their home in the form of cash. Looking at the facts and circumstances of petitioners' lifestyle, we do not believe their claim. First, we find it unlikely that during college and while petitioner was training for the Olympics petitioners were able to save $ 37,500 (which they claim the had), even if they did receive a substantial amount as gifts. Schedule G, Income Averaging, attached to petitioners' 1977 income tax return, reflects taxable income for 1973-1976 as $ 0, $ 1,921, $ 5,235, and $ 12,956, respectively. It is incredible, based on their reported income, that they would have had the wherewithal to save every penny of every gift as well as the money petitioner's parents gave in the form of loans. Second, it is incredible that a person who earns a living selling investments would not only fail to invest at least some of his own money, but would not even put it in the bank. Third, we note that petitioners deducted $ 36,675 for alleged commissions (not including the $ 9,000 loan *148 repayment) in 1979, which we are not convinced were paid for the purpose claimed. That sum, invested at 9 percent, would yield an amount very close to the $ 39,146.99 returned to petitioners in 1980. Finally, in 1978 when they bought their first home, petitioners borrowed approximately $ 9,000 of the $ 12,500 down payment from petitioner's parents. This too casts doubt on the veracity of petitioners' claim of a cash hoard. In light of the foregoing, petitioners have failed to prove that the $ 39,146.99 was not properly included in their 1980 income. (2)(a) Employee Business Expense
On or about March 22, 1980, petitioner signed an employment contract with M. H. Meyerson & Co., Inc. to become manager of its new Fort Lauderdale office. Before the opening he was required to attend a training program in New Jersey from April to August. Petitioner presented receipts for expenses incurred while living away from home in New Jersey totalling $ 3,207.42. These expenses included trailer rental/U-haul ($ 411.49), telephone bills ($ 215.26), gasoline bills ($ 64.35), rent expenses ($ 2,348), and hotels between Florida and New Jersey ($ 121.32). Petitioner claimed $ 3,329 and respondent *149 disallowed the deduction in total. Under his employment contract with M. H. Meyerson & Co., Inc., petitioner was reimbursed for 50 percent of the expenses incurred while living away from home. Petitioner included the reimbursement in income. See note 11, infra.
Section 162(a) generally provides a deduction for all the ordinary and necessary expenses incurred in carrying on a trade or business during the taxable year. These deductions include expenses incurred while traveling away from home in the pursuit of a trade or business. Section 162(a)(2). To deduct travel expenses while away from home the following conditions must be satisfied: (1) the expense must be a reasonable and necessary traveling expense, (2) the expense must be incurred while away from home, and (3) the expense must be incurred in the pursuit of a business. [Flowers v. Commissioner,326 U.S. 465 (1946).] Additionally, traveling expenses while away from home are subject to the substantiation requirements of section 274(d). Respondent disallowed all of petitioner's deductions claimed for expenses incurred while living away from home either because the deduction was duplicative, *150 or it was a nondeductible personal expense. Respondent contends that petitioner's expenses are nondeductible because petitioner was engaged in a training program. Respondent argues that these expenses were therefore not incurred in a trade or business. Respondent relies on Rosenblum v. Commissioner,[9] a Memorandum Opinion of this Court, in support of his position. Respondent's reliance is misplaced. In Rosenblum we held that the taxpayer's "tax home" was Baltimore; therefore the taxpayer was unable to deduct living expenses while temporarily in Baltimore for a training program. In Rosenblum, as in other cases dealing with this subject, the ability to deduct costs incurred while living away from home exists for two reasons. The first reason is to compensate the taxpayer for duplication of living expenses. The second is to allow for the increased cost of meals and lodging incurred while traveling for business. James v. United States,308 F.2d 204 (9th Cir. 1962). In this case it is clear that petitioner's "tax home" was in Florida. Even though both petitioner and his wife moved to New Jersey for the *151 summer, they still maintained a house in Florida. Moreover, petitioner's assignment in New Jersey was temporary. See Peurifoy v. Commissioner,358 U.S. 59 (1958). He intended to and did move back to Florida for the purpose of opening a Fort Lauderdale office of M. H. Myerson & Co., Inc. Thus, as long as petitioner's incurred expenses were reasonable, they are deductible under section 162(a)(2). The same is not true for expenses incurred by April McIntyre while living in New Jersey. She chose to go there for the summer without any business purpose; therefore her expenses are nondeductible personal expenses. Trailer expenses moving from Florida to New Jersey and then back to Florida are deductible. Petitioner substantiated the amount and there is no question as to the business purpose. Petitioner's deduction for telephone and gas expenses while in New Jersey pose a different problem. While petitioner substantiated the amount of these expenditures, he did not substantiate their business purpose. Moreover, April McIntyre also used these items. We have no evidence of allocations between personal and business use. Under section 274, we are unable to estimate any *152 deduction. The remaining expenses claimed as living away from home deductions are disallowed because they are duplicative of previously allowed miscellaneous deductions for hotel and lodging. (See below.) Petitioner claims he is entitled to deduct the rental expense of $ 2,348 twice because M. H. Meyerson & Co., Inc. reimbursed him for rent and therefore he had included the amount as income. Petitioner fails to realize, however, that deducting the expense once in effect cancels out the fact that he included the reimbursement in income. To allow petitioners to deduct the expense twice would allow them to deduct an expense they did not actually incur. Thus, it is clear petitioners are not entitled to deduct additional rent as a business expense while living away from home. Petitioners also claimed employee business expenses of $ 4,661 which included car expenses ($ 4,246), auto rental ($ 294), tolls ($ 58), and parking ($ 63). Respondent allowed all of the expenses for auto rental, parking and tolls. Respondent allowed only $ 1,756 of the car expenses. Petitioners based their claim on actual expenses. Petitioners presented respondent with receipts which exceeded their deductions. *153 However, respondent disallowed invoices signed by April McIntyre, expenses incurred while petitioner was living away from home and reduced everything by 50 percent as an allocation between business and personal use. This resulted in a total allowable deduction of $ 1,777.05. [10]
Petitioner has failed to show that the car was used more than 50 percent in business. Thus the amount of substantiated expenses should be reduced by 50 percent. However, the total should not be reduced by the amount of gas signed for by April McIntyre. It seems clear that by stating the car was used 50 percent in business and 50 percent for personal use, respondent has already taken into account that April McIntyre made use of the car. Petitioner claimed gasoline expenses in two places. He claimed $ 64.35 as part of his expenses of living away from home, which we disallowed *154 for failure to substantiate a business purpose under section 274. He separately claimed, as part of his overall auto expenses, an additional $ 379.67 for gasoline expenses incurred in New Jersey. As before, he has not established a business purpose for these expenses, and they are disallowed. Smith v. Commissioner,80 T.C. 1165, 1172 (1983). (b) Miscellaneous Itemized Deductions
In 1980 petitioners claimed miscellaneous itemized deductions of $ 10,686. Respondent made adjustments in petitioners' claimed hotel and lodging expenses, air fare expenses and entertainment expenses totalling $ 4,313. Respondent allowed $ 3,698 of petitioner's claimed hotel and lodging expenses including four months' rent while petitioner was living away from home. [11]
*155 Respondent allowed $ 737 of petitioner's claimed air fare expenses but disallowed $ 911 in air fare as commuting expenses while petitioner was living away from home and $ 238 because it was a duplication of an allowed deduction. Respondent also allowed petitioner deductions of $ 1,033 for entertainment expenses, the total amount petitioner substantiated in terms of date, location, amount and business purpose. Finally, petitioner incurred $ 1,466 in office supply expenses during 1980. Respondent disallowed 50 percent of that amount as reimbursed by M. H. Meyerson & Co., Inc. We agree with respondent's adjustment in petitioner's air fare deduction. One flight was duplicative and therefore not deductible. The other flights were between New Jersey and Florida. Personal expenses are nondeductible expenses. The fact that petitioner's tax home was so far away from where he was engaged in business will not transform nondeductible personal expenses into deductible travel expenses. Moreover, petitioner's arguments that he was reimbursed for these expenses and that these payments were included in his income are not helpful. If M. H. Myerson & Co., Inc. chose to fly petitioner back and *156 forth to Florida on weekends during the month of May, without a business purpose, it is a form of compensation to petitioner and is properly includable in his income. Petitioners are not entitled to deduct air fare beyond what respondent has previously allowed. Respondent allowed all but $ 129 of petitioners' claimed hotel and lodging expenses of $ 3,827. Petitioners presented no evidence to substantiate the additional $ 129. Since these expenses are subject to the additional substantiation requirements of section 274(d), we are foreclosed from allowing petitioners any additional deduction for hotel and lodging. Similarly, petitioners documented only $ 1,033 of their claimed entertainment expenses, which were completely allowed by respondent. Without any evidence to support the remainder of the claimed entertainment expenses, we are precluded from allowing an increased deduction under section 274(d). Finally, petitioners substantiated $ 1,466 in office supplies. Petitioner was reimbursed for 50 percent of these costs, and the amount was included in his wages. Petitioner contends he is therefore entitled to deduct the total amount. We agree. [12] Therefore, petitioner is *157 entitled to a deduction of the full amount of office supplies. [13]
Sales Tax Deduction
In 1980 petitioners claimed a sales tax deduction in excess of the table amount allowed for Florida residents during that year. Petitioners presented no evidence at trial to substantiate their claim. Therefore, they have failed to meet their burden of proof and cannot deduct any amount greater than that allowed by respondent. (3) Computer Software Investment
In 1980 petitioners purchased a computer software program entitled Residential Property Management Systems (the System) from CCI Concepts, Inc. (CCI). Petitioners paid $ 25,000 in 1980 and $ 3,000 in 1981 toward the purchase price. The remaining $ 472,000 was in the form of a non-recourse promissory note. The System was developed, designed and manufactured by Adam Systems, a division of a wholly-owned subsidiary of Multicom Corporation. The System *158 was developed to be used in conjunction with either of two Data General computers with a MICOS operating system. In 1980 the standard operating system for the Data General Computer was RDOS, not MICOS, which was a company separate from Data General. In general, when Data General or another company sold its computers its own operating system was included as part of the total purchase price. Thus, it was unusual for a purchaser, especially a first time purchaser, to buy computer hardware from one vendor and the operating system from another vendor. In conjunction with purchasing the System petitioner received a Confidential Purchase Memorandum (memorandum). Howard Edrich, who worked for M. H. Meyerson & Co., Inc. in New Jersey, was the owner and president of CCI. Edrich brought the memorandum to petitioner at his home in Florida. The memorandum contained information on the potential tax consequences and risk factors involved in investing in the System. The memorandum stressed that the tax consequences could change or be eliminated through legislative, judicial or administrative actions and that an investor had to be prepared for the possibility of losing his entire investment. *159 The memorandum also stated that no investor should rely solely on the representations in the memorandum and stressed the importance of seeking independent investment and tax advice. Petitioner did not get independent tax advice. In making his investment decision he relied on representations of Edrich, the appraisal provided by CCI, conversations with his brother-in-law, and information he had learned through magazine articles. On December 2, 1980 petitioner and CCI executed a purchase agreement for the System. As part of the agreement the seller, CCI, agreed to sell, in pertinent part: (a) All computer software (object code and source code) operational and technical manuals referencing the software, record layouts, record formats, and any other materials necessary to execute the computer software programs and other materials and computer software related to the System (the "Programs"). [Emphasis added.] * * *
Petitioner never received the operating manuals or other materials to run the program. In fact, petitioner never ran the program; nor could respondent run the program without operating instructions. Edrich and CCI's appraisal represented that petitioner *160 could expect about 1,300 potential users and that he could capture about five percent of that market, which could yield him approximately $ 1,600,000. Petitioner, however, failed to independently investigate the market that existed in his territory (Minnesota and Missouri). Petitioner never sold one program. On his cash investment of $ 25,000 petitioner claimed a loss deduction of $ 28,000 on his 1980 Federal income tax return related to his investment in the System. [14] Petitioner also claimed an investment tax credit of $ 45,000. In December of 1981 petitioners filed Form 1045 (Application for Tentative Refund) claiming a carryback for unused investment tax credit from the purchase of the system for 1977 through 1979 in the amounts of $ 1,543, $ 288 and $ 3,360, respectively. Respondent disallowed the $ 28,000 loss deduction because petitioners had not established that they incurred the loss in a trade or business or with respect to property held for the production of income. Alternatively, respondent disallowed the depreciation *161 deduction because petitioners failed to establish the basis of the software, that the deduction bore a close relationship to the software's decline in usefulness and because the nonrecourse note of $ 472,000 lacked economic substance and was not a bona fide debt. We agree with respondent's primary argument and therefore find it unnecessary to address his alternative position. In order to be entitled to depreciation deductions under section 167 petitioners must prove the depreciable property is used in a trade or business or for the production of income. Unless the taxpayer's primary purpose and intention in engaging in the activity is to make a profit, the activity does not constitute a trade or business. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 505 (1982). Similarly, deductions taken under section 212(1) and (2) require a profit making objective. Lemmen v. Commissioner,77 T.C. 1326 (1981). Petitioner has the burden of proving a profit making objective in his computer *162 software activities in order to depreciate the software under section 167. Flowers v. Commissioner, supra at 932. In determining whether petitioner has the requisite profit motive, we give greater weight to the objective factors than to petitioner's mere statement of his intent. Section 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra; Flowers v. Commissioner, supra; Siegel v. Commissioner, supra.
Some relevant factors in determining whether an activity is engaged in for profit are set out in section 1.183-2(b), [15] Income Tax Regs. And, although section 183 is an allowance provision for limited deductions in non-profit making activities, the inquiry into the taxpayer's profit making objective is the same. [16]Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner, 734 Fd.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), *163 affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd without published opinin sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). A careful analysis of the objective facts and circumstances in this case shows that petitioner did not possess the requisite profit objective. *164 Petitioner did not conduct the computer software enterprise in a businesslike manner. Petitioner made no independent investigation as to the profit potential of the system. Instead, he relied solely on the representations and statements of CCI, the seller. Petitioner did not investigate the marketability of the system in his designated territories of Minnesota or Missouri prior to purchasing the system. In fact, petitioner never even ran the program to see if it was operative. He never received any operational manuals from the seller, and apparently never made any effort to get the manuals after receiving the System. After purchasing the System petitioner entered into a distribution agreement with Systems Distributors, Inc. (SDI) to market the system in petitioner's territories. SDI was an affiliate of Adams Minicomputer Systems, Inc., (Adams) the manufacturer of the program. Petitioner was aware of the affiliation since both SDI and Adams had the same corporate president, who executed all the documents, and the same corporate addresses. Petitioner was also aware that SDI had limited resources and personnel and had not made any sales outside metropolitan New York. In *165 spite of petitioner's knowledge not only did he enter the distribution agreement, but he failed to terminate the agreement after SDI made no effort to distribute the System in petitioner's territories. Petitioner claims that SDI was not required to distribute the System until after petitioner made an additional payment, which became impossible because of petitioner's change in financial status in 1981. The terms of the distribution agreement, however, specify that SDI could deduct its fees directly from the revenues received. Petitioner also had no experience in the computer industry. He obtained most of his knowledge from his brother-in-law and through magazine articles. Despite numerous statements throughout the purchase memorandum to consult independent counsel and advisors, petitioner failed to do so. Instead, petitioner chose to rely on the statements of Howard Edrich, the president of CCI, as to the profitability of the System. Again, petitioner's actions were in spite of the statement in the memorandum that neither CCI nor Mr. Edrich "had any significant experience in connection with computers, software systems, or the marketing thereof". Petitioner's claim of a profit *166 objective is unpersuasive in this case. We do not believe a serious and prudent investor would undertake an investment such as this without more effort, inquiry and guidance. Thus, petitioner is not entitled a $ 28,000 loss on his investment in the computer software system. Petitioner also claimed an investment tax credit of $ 45,000 in connection with their purchase of the computer software program. Of that amount, $ 7,039 was claimed on their 1980 Federal income tax return and $ 1,543, $ 288 and $ 3,360 were carried back and claimed in 1977, 1978 and 1979, respectively. Generally section 38 allows a credit against tax for investments in certain depreciable property. Thus, a prerequisite to qualify for an investment tax credit is showing the property is in fact depreciable. As stated above, in order to be able to depreciate property a taxpayer must show the property is used in a trade or business or held for the production of income. Petitioner has failed to show that the software was used in a trade or business, or that it was held for the production of income. Since the computer software is not depreciable, it also does not qualify for an investment tax credit. *167 Fraud
The final issue to be resolved is whether petitioners are liable for the 50 percent addition to tax for fraud under section 6653(b) for the taxable years 1977 through 1980, inclusive. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must prove fraud for each year he asserts the addition to tax under section 6653(b). Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). Whether fraud exists is a question of fact, determined upon consideration of the entire record. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). *168 Fraud is not imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proven by circumstantial evidence since direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra at 1123. Respondent relies on two particular points to prove fraud for the 1979 taxable year. First, respondent states that petitioner originally claimed April McIntyre mismarked the $ 9,000 check "for home loan," but at trial petitioner testified he made the mistaken notation. Respondent concludes the change in story is an attempt to mislead respondent's counsel and the Court and is indicative of petitioner's deliberate scheme to defraud. Second, respondent relies on the fact that petitioners claimed a $ 9,900 casualty loss on a boat due to fire, and that petitioners failed to prove a fire occurred. We do not think the identity of the person who wrote "for home loan" is material. In fact, we have found that the notation was accurate -- i.e., the payment was indeed for a home loan. Much more indicative of fraud, however, is petitioner's attempt to deduct this loan repayment as a commission expense. Furthermore, *169 petitioner attempted to substantiate the $ 9,000 and other purported "commission" payments by attaching copies of forms 1099 to his return, without filing the proper copies with respondent or providing respondent with the Social Security numbers of the recipients. We believe this was a deliberate attempt to substantiate false deductions, while shielding the purported recipients from respondent's attention. Furthermore, we agree with respondent that petitioner claimed a casualty loss to which he knew he was not entitled. We do not believe petitioner's boat burned. Neither do we think petitioner could possibly have believed his basis was $ 13,000 when it was really only $ 400. Moreover, he claimed a post-casualty value was $ 100 when he actually sold the boat for $ 150. The combination of these actions warrant a finding that petitioners intended "to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes." The addition to tax for fraud was correctly imposed on Michael McIntyre for the 1979 taxable year. There is no evidence in the record of fraud on the part of April McIntyre in 1979. We therefore decline to sustain *170 fraud as to her. Respondent relies primarily on petitioners' unreported income of $ 39,146.99 for the imposition of the addition to tax for fraud for 1980. But respondent cannot satisfy his burden of proof by relying solely on petitioners' failure to prove error in respondent's determination. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent has not shown a taxable source of the funds which were returned to petitioners. Thus, respondent has not proved, by clear and convincing evidence, that petitioners' underpayment of tax in 1980 was due to fraud. Therefore, the addition to tax for fraud will not be imposed against either petitioner for the 1980 taxable year. Finally, respondent claims that petitioners are liable for additions to tax for fraud for the 1977 and 1978 taxable years because on December 11, 1981, they filed an Application for Tentative Refund, claiming a carryback of unused investment tax credits for 1977, 1978 and 1979. Respondent relies on the fact that petitioners claimed the credit without having *171 put the software into service, knowing full well from the purchase memorandum that placement into service is a prerequisite to claiming the credit. The purchase memorandum states in pertinent part "a taxpayer is entitled to a 10% investment tax credit based on the cost of depreciable tangible personal property placed in service during that tax year". Petitioner admits that he read the memorandum. Therefore, he is responsible for knowing its contents. The evidence shows that petitioner entered into a distribution agreement with SDI in 1980. The evidence also shows that the System was never distributed on behalf of petitioner. It is true that entering into this contract did not place the System into service. however, the term "placed in service" is a term of art. Respondent has not requested, and we have not made a finding that the system was not "placed in service" in 1980. [17] Moreover, there was no evidence presented that petitioner knew, at the time he filed for the investment tax credit carryback, that the signing of the contract was not sufficient to place the program "in service" within the meaning of the law. Respondent has failed to prove fraud by clear and convincing *172 evidence and the additions to tax for fraud will not be imposed against either petitioner for the 1977 or 1978 taxable years. Decision will be entered under Rule 155.
Footnotes
1. For convenience and clarity we have combined our findings and opinions and present them chronologically issue by issue, with the exception of general findings of fact which are so labeled. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as applicable to the year in issue. All Rule references are to the Tax Court of Practice and Procedure. ↩
3. So stipulated. According to the Schedule K-1 forms attached to petitioners' 1979 income tax return April McIntyre owned 300 shares and Michael McIntyre owned 510 shares. The names of the owner(s) of the remaining 190 shares are not in the record. ↩
4. So stated on Schedule K-1, Form 1099. ↩
5. The record does not show whether the commissions came through Investacorp or direct, but the Schedule C indicates all items thereon pertain to Investacorp. ↩
6. The appropriate tax treatment if petitioner were a conduit would be no income and no deduction. ↩
7. Substantiation of travel and entertainment expenses are subject to the strict requirements of section 274(d) which provides: (d) Substantiation Required. -- No deduction or credit shall be allowed -- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, (3) any expense for gifts, or (4) with respect to any listed property (as defined in section 280F(d)(4)), unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (b) the time and place of the travel, entertainment, amusement, recreation or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift. The Secretary may be regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. This subsection shall not apply to any qualified nonpersonal use vehicle (as defined in subsection (i)). ↩
8. Risicato v. Commissioner,T.C. Memo. 1984-238↩ and cases cited therein. 9. T.C. Memo. 1970-111↩. 10. No explanation was provided for the discrepancy between the amount allowed by respondent $ 1,756 and the adjustments, presented in respondent's brief, which indicate allowable deductions of $ 1,777.05. Since respondent argues $ 1,777.05 on brief we assume he concedes another $ 26.05 was a deductible automobile expense. ↩
11. The fact that respondent allowed petitioner to deduct four months rent which was reimbursed by M. H. Meyerson & Co., Inc. adds a further degree of believability to petitioner's claim that the reimbursement was included in his income. It seems clear to us that petitioner must have included the rental reimbursement in his income or respondent would not have allowed any deduction at all for the four month rental expense. ↩
12. See n. 11, supra.↩
13. Petitioner deducted only $ 1,378 for office supplies on his 1980 return. Since he proved expenses of $ 1,466 we will treat it as an amendment to his petition tried by consent under Rule 41(b)(i) on which he has met his burden of proof. ↩
14. The deduction was a result of a depreciation deduction in the amount of $ 64,285 reduced to the amount petitioner claimed to have "at risk." ↩
15. Under section 1.183-2(b) the factors to consider are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity. Section 1.183-2(b), Income Tax Regs. No single factor is controlling; rather an evaluation of all the facts and circumstances is determinative. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170↩ (9th Cir. 1981). 16. Petitioners are not entitled to any limited deductions for activities not engaged in for profit because they earned no income from the activity. Section 183(b) provides (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). ↩
17. Respondent's requested finding No. 106 is "Michael McIntyre did not intend to put the RPMs into service until the spring of 1981." Petitioner's actual testimony was, "It was my intention at the time that I purchased this, which was the end of 1980, to gear up and get cranking in business in the spring of 1981. . . ." ↩